UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

Chambers of
Matthew J. Maddox
United States Magistrate Judge
MDD_MJMChambers@mdd.uscourts.gov

101 West Lombard Street
Chambers 3B
Baltimore, Maryland 21201
(410) 962-3407

January 27, 2023

TO ALL COUNSEL OF RECORD

Re:   *Laura H. v. Kijakazi*
      Civil No. MJM-21-2531

Dear Counsel:

Plaintiff Laura H. commenced this civil action seeking judicial review of the final decision of the Commissioner of Social Security Administration ("SSA," "Defendant") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. (ECF 1). Pending before the Court are Plaintiff's Motion for Summary Judgment (ECF 12) and Defendant's Motion for Summary Judgment (ECF 13).[1] I have reviewed the pleadings and the record in this case and find that no hearing is necessary. Loc. R. 105.6. (D. Md. 2021). The Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed. 42 U.S.C. §§ 405(g), 1383(c)(3); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020). Under this standard, Plaintiff's motion will be DENIED, Defendant's motion will be GRANTED, and the SSA's decision will be AFFIRMED.

I.      **Background**

Plaintiff filed her application for DIB and SSI on June 27, 2018, alleging disability beginning June 1, 2017. (R. 17). Plaintiff's application was initially denied on February 21, 2019, and the initial determination was affirmed upon reconsideration on September 20, 2019. (*Id.*) Thereafter, Plaintiff requested an administrative hearing, and Administrative Law Judge (the "ALJ") Robert Baker, Jr. held a telephone hearing on September 23, 2020. (R. 17, 32–60). Plaintiff, who was represented by counsel, testified at the hearing. (*Id.*) An impartial vocational expert also appeared and testified. (*Id.*) Following the hearing, the ALJ issued a decision denying Plaintiff's claims for DIB and SSI on November 23, 2020. (R. 17–26). On July 30, 2021, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (R. 1–6). Plaintiff then filed this civil action seeking judicial review under 42 U.S.C. § 405(g).

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF No. 7).

*Laura H. v. Kijakazi*
Civil No. MJM-21-2531
January 27, 2023
Page 2

## II.     The SSA's Decision

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining Plaintiff's disability claims, the ALJ followed the five-step sequential evaluation of disability set forth in 20 C.F.R. § 416.920.

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

*Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015). If the first three steps do not yield a conclusive determination of disability, the ALJ then assesses the claimant's residual functional capacity ("RFC"), "which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Id.* at 635 (quoting 20 C.F.R. § 416.945(a)(1)). The ALJ determines the claimant's RFC by considering all of the claimant's medically determinable impairments, regardless of severity. *Id.* The claimant bears the burden of proof through the first four steps of the sequential evaluation. *Id.* If she makes the requisite showing, the burden shifts to the SSA at step five to prove "that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting 20 C.F.R. §§ 416.920, 416.1429).

In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2017, the alleged onset date. (R. 20). At step two, the ALJ found that Plaintiff had one severe impairment: narcolepsy. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22). Then, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except:

> lifting/carrying 20 pounds occasionally and 10 pounds frequently. [Plaintiff] can sit for 6 hours in an 8-hour workday; stand for 6 hours in an 8-hour workday; and walk for 6 hours in an 8-hour workday. [Plaintiff] can push/pull as much as she can lift/carry. Further, the claimant can frequently balance, occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; however, she can never climb ladders, ropes, or scaffold. Moreover, . . . [Plaintiff] can work at unprotected heights; however, she must avoid

*Laura H. v. Kijakazi*
Civil No. MJM-21-2531
January 27, 2023
Page 3

> concentrated exposure to moving mechanical parts, humidity and wetness, dust, odors, fumes, and pulmonary irritants, as well as extreme heat/cold.

(*Id*.) At step four, the ALJ found that Plaintiff "is capable of performing past relevant work as an Accounts Receivable Clerk," and this work did not require the performance of work-related activities precluded by her RFC. (R. 25). Thus, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from June 1, 2017, through November 23, 2020. (*Id.*)

### III.     Standard of Review

The Court reviews an ALJ's decision to ensure that the ALJ's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id*. (internal quotation marks and citations omitted). In accordance with this standard, the Court does not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal brackets and citations omitted). Instead, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Id*. (citation omitted).

### IV.      Discussion

Plaintiff raises two issues: (1) whether the ALJ erroneously assessed her RFC; and (2) whether the ALJ erroneously evaluated her subjective complaints. (ECF 12-1 at 3–15). Because these issues are closely related to the ALJ's evaluation of the objective medical records, Plaintiff's subjective statements, and her provider's physical residual functional capacity questionnaire, the Court begins by analyzing the RFC discussion in the ALJ's opinion and the records cited therein.

It appears that Plaintiff was first diagnosed with narcolepsy in 2009. The record includes a polysomnogram ("PSG") report, dated May 13, 2009, from Konrod W. Bakker, M.D. at Frederick Sleep Disorders Center. (R. 442). It reported that Plaintiff's "score on the Epworth Sleepiness Scale was 14/24, which suggests moderate daytime sleepiness." (*Id*.) It noted that Plaintiff complained about "excessive sleepiness" but concluded that the "[s]ubjective sleepiness is not explained by [the polysomnogram] study" and recommended that "the daytime Multiple Sleep Latency Test (MSLT) is needed to diagnose narcolepsy." (*Id*.) Dr. Bakker later opined in a MSLT report, dated May 18, 2009, that "[g]iven the history and results of the polysomnogram, the [MSLT] results are consistent with a diagnosis of narcolepsy." (R. 444).

The record shows that Sarah E. Jamieson, PA-C of Comprehensive Neurology & Sleep Medicine, treated Plaintiff for her narcolepsy from June 2012 to June 2018, then from January to June 2020; and Shahid Rafiq, M.D. and colleagues at Comprehensive Neurology Services, P.A.

*Laura H. v. Kijakazi*
Civil No. MJM-21-2531
January 27, 2023
Page 4

treated Plaintiff from November 2018 to June 2019.[2] (R. 325–28, 347–98, 417–36, 454–67).

The record also reflects that in 2012 and 2013, Plaintiff functioned well with the medication Vyvanse (40mg capsule, up to two pills per day) and her Epworth Sleepiness Scale was 10/24 and 12/24. (R. 389–93). In December 2013, Plaintiff started to report that she struggled to wake up in the morning to drive her son to school and had to nap afterwards. (R. 385–87). She also noted that stress exacerbated her sleepiness. (*Id.*) From December 2013 to early 2016, in addition to Vyvanse, Plaintiff used Nuvigil and/or Provigil as needed. (R. 369–87). Then she started to use Adderall instead of Nuvigil and Provigil. Even though Ms. Jamieson prescribed other medications for Plaintiff to try, such as Xyrem and Sunosi (R. 365, 460), Plaintiff consistently used Vyvanse (40mg capsule, up to two pills per day) and Adderall (10mg table, up to 2.5 in a day) starting in 2016 (R. 347–69, 417–36, 454–64).

From December 2013 to November 2016, Plaintiff's Epworth Sleepiness Scale ranged from 16/24 to 18/24. (R. 363, 367, 377, 381, 383, 387). The last score before the onset date was 18-19/24, conducted in February 2017. (R. 361). Days before the onset date, during a visit to Ms. Jamieson, Plaintiff reported that she "just completed her first year of college" and "was on the Deans list with a 4.0." (R. 357–59). Her stress level was high, and she went to bed at around 1:00 a.m. because "she did her schoolwork in the evening as it was due at midnight." (R. 359). In September 2017, Plaintiff reported that she lost her house in July 2017, and she was completely out of medications and was not functioning. (R. 355–56). Her Epworth Sleepiness Scale was 22/24. (R. 359.) No other measurement was conducted until Plaintiff's visit to Ms. Jamieson in January 2020, when her Epworth Sleepiness Scale was 17/24. (R. 460–62).

In early 2018, Ms. Jamieson recommended that Plaintiff to call Johns Hopkins University's sleep clinic "to see if they are doing clinical trials or if they have a consultation at a reasonable time for narcolepsy." (R. 352). Additionally, Ms. Jamieson apparently noted the effects of stress on Plaintiff's sleepiness and tried to address it with medications such as Wellbutrin and Prozac, neither of which was helpful. (R. 349). Dr. Rafig and colleagues who treated Plaintiff from November 2018 to June 2019 also commented that "she is unsure if she is depressed b/c she is tired all the time or if she is tired because she is depressed." (R. 425). Because Plaintiff did not have a psychiatrist, they gave her a "referral for evaluation of depressed mood." (*Id.*) The providers also considered another PSG followed by an MSLT "as it was done 10 years ago . . . ." (*Id.*) It is not clear whether Plaintiff followed up on any of these recommendations.

Finally, in a physical residual functional capacity questionnaire dated September 22, 2020, Ms. Jamieson opined that Plaintiff's diagnosis of narcolepsy had a poor prognosis. (R. 470–73). Her Epworth Sleepiness Scale was 24/24 at the time. (R. 470). According to Ms. Jamieson, Plaintiff would require unscheduled breaks one to two times per day, with each break lasting two to three

---

[2] Ms. Jamieson and Plaintiff's primary care provider Syed Wasimul Haque, M.D. referred to Plaintiff's condition as "Narcolepsy W/O Cataplexy" or "Narcolepsy without cataplexy." (*See e.g.*, R. 325, 330, 349, 457). Plaintiff's providers at Comprehensive Neurology Services, P.A. identified the condition as "Narcolepsy in conditions classified elsewhere with cataplexy – G47.421." (R. 417, 421, 425, 430, 434).

hours. (R. 472). Ms. Jamieson opined that Plaintiff's condition would involve "good" and "bad" days, and "bad" days would cause her to miss work more than four days per months.[3] (R. 473).

### A. ALJ's RFC Analysis

Turning to the arguments presented here, Plaintiff first challenges the ALJ's RFC assessment pursuant to SSR 96-8p. (ECF 12-1 at 3–11). In assessing RFC, the ALJ must consider all relevant evidence of the claimant's impairments and any related symptoms. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). The ALJ is required to "identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Id.* at *1. The ALJ must present a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," and must then "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*. at *7.

Plaintiff specifically argues that, although the ALJ found Plaintiff's narcolepsy to be a severe impairment, he "failed to include RFC limitations related to Plaintiff's excessive daytime sleepiness, her primary complaint." (ECF 12-1 at 6). However, the ALJ specifically stated that he acknowledged that Plaintiff has functional limitations due to her narcolepsy (R. 24). Although some of the medical sources opined that Plaintiff could perform a range of work consisting of no exertional limitations, the ALJ found that a limitation to light exertion is appropriate, "given the nature of the claimant's impairment and affording her every benefit of the doubt." (*Id*.)

Plaintiff also argues that the ALJ failed to provide adequate explanation to support his RFC assessment. Plaintiff seems to suggest that the ALJ's evaluation of the medical record in a single paragraph is inadequate. The ALJ stated:

> Turning to the medical records, the claimant has a history of narcolepsy without cataplexy (see Exhibits 1F, 2F, 3F, and 8F). She complained of excessive sleepiness, memory and concentration difficulties. During the relevant period, the claimant's neurologist noted little in the way of objective findings, with a normal neurologic examination (see e.g., Exhibits 3F/12, 15, 17, 22, 25, 27; 6F/7, 11, 15-16, 20, 23; and 10F/3-4, 7, 10, 14). Treatment consisted of medications such as Adderall, Mydayis, Wakix, and Vyvanse, [as] well as work with a sleep schedule, with some, but incomplete improvement noted (see e.g., Exhibits 3F/11, 22; 10F/2, 3). The undersigned finds that the claimant's narcolepsy limits her to a range of light work, with additional postural and environmental limitations as set forth in the residual functional capacity finding.

---

[3] Ms. Jamieson states that Plaintiff's impairments have not lasted and are not expected to last for twelve months (R. 470), as required to find a disability. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a) & 416.905(a).

(R. 23). Citing Program Operations Manual System ("POMS") DI 24580.005, which discusses the evaluation of narcolepsy, Plaintiff argues that "although the Commissioner has specifically recognized that there are no physical abnormalities with narcolepsy, and that laboratory studies will be normal," the ALJ "discounted the Plaintiff's complaints on the basis that there was little in the way of objective findings." (ECF 12-1 at 7–8).

Plaintiff's argument misses the mark. In the physical residual functional capacity questionnaire, Ms. Jamieson identified MSLT and Epworth Sleepiness Scale scores as the clinical findings and objective signs of Plaintiff's impairment. The record shows that Plaintiff had an MSLT in 2009. (R. 442). No other MSLT was conducted, although it was contemplated in 2019. (R. 425). Moreover, before the onset date, Ms. Jamieson assessed Plaintiff's Epworth Sleepiness Scale once or twice a year during her visits (*see, e.g.*, R. 361, 363, 367, 377, 381, 383, 387, 391, 393), but the assessment was rarely conducted after the onset date. (R. 355, 460). Thus, the ALJ's concern about the lack of objective findings in the record is not unfounded.

Furthermore, while Plaintiff acknowledges the importance of "obtain[ing] from an ongoing treatment source . . . an adequate description of [Plaintiff's] alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis," she cites no evidence concerning any narcoleptic attacks and secondary events. (ECF 12-1 at 8–9 (citing POMS DI 24580.005)). Ms. Jamieson diagnosed Plaintiff with narcolepsy without cataplexy, and the record contains the medications she tried and Plaintiff's response to medications as well as discussion of Plaintiff's general description of her conditions, such as excessive sleepiness and difficulties waking up on time. (R. 347–94, 417–36, 454–64). But minimal discussion is documented concerning secondary events, such as cataplexy, hypnagogic hallucinations or sleep paralysis. And neurologic examinations of Plaintiff were mostly normal, as Plaintiff pointed out in her brief. (*See* ECF 12-1 at 8). Therefore, the ALJ's evaluation of the medical record is consistent with the evidence submitted, which adequately supports his RFC findings.

Plaintiff next argues that the ALJ failed to properly evaluate the opinions of Ms. Jamieson, Plaintiff's long-time treating health care provider. (ECF 12-1 at 9–11). Ms. Jamieson reported in a physical residual functional capacity questionnaire that Plaintiff experienced excessive sleepiness, inability to waken, sleep attacks, and resultant depression and loss of concentration, and that she had minimal response to medication. (R. 470). Ms. Jamieson also opined that Plaintiff would require unscheduled breaks one to two times per day, with each break lasting two to three hours that Plaintiff's "bad" days would cause her to miss work more than four days per months. (R. 472).

For claims filed on or after March 27, 2017 (such as Plaintiff's claim in this case), an ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a claimant's medical source." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers medical opinions and prior administrative medical findings using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with other evidence in the claim and understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §

404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion. 20 C.F.R. § 404.1520c(a). The ALJ is not required to explain the consideration of the other three factors. 20 C.F.R. § 404.1520c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Plaintiff avers that the ALJ failed to directly address the factors of supportability and consistency. (ECF 12-1 at 10–11). The ALJ found Ms. Jamieson's opinion unpersuasive, "as it is inconsistent with and unsupported by the record." (R. 24). The ALJ reasoned that "there is little in the way of objective evidence to support such extreme limitations of function." (*Id*.) As discussed above, the record lacks objective findings that support Ms. Jamieson's opinion. Her opinion is inconsistent with the medical records evaluated and summarized by the ALJ. (R. 23). Moreover, Ms. Jamieson's opinion is inconsistent with other medical opinions. For example, Dr. Lowen, whose opinion was found somewhat persuasive by the ALJ, stated that Plaintiff could perform a range of work consisting of no exertional limitations but with certain non-exertional limitations. (R. 24, 69–70). State agency physician Jack Hutcheson, M.D., whose opinion was found persuasive, concluded that Plaintiff could perform a range of light work (R. 24, 97–99). Therefore, Plaintiff fails to establish that the ALJ erred in his assessment of Plaintiff's RFC.

### B. ALJ's Evaluation of Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erroneously required the Plaintiff to prove the type and degree of her subjective complaints by objective medical evidence. (ECF 12-1 at 14). Plaintiff also argues that while the ALJ noted that her care has been routine and conservative throughout the relevant period, he failed to identify what non-routine and non-conservative treatment options have been available to her. (*Id*.) Furthermore, Plaintiff avers that in suggesting that the Plaintiff's treatment would not be routine or conservative if her narcolepsy was as severe as she alleged, the ALJ is exercising an expertise in the field of medicine which he does not possess. (*Id*. at 14–15).

To evaluate a claimant's subjective symptoms, the ALJ must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (S.S.A., Mar. 16, 2016). *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). "First, the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). "Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.* (quoting 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4).

*Laura H. v. Kijakazi*
Civil No. MJM-21-2531
January 27, 2023
Page 8

When considering the intensity, persistence, and limiting effects of the symptoms, the ALJ examines the entire case record, including the objective medical evidence; the claimant's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the case record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4–7. The ALJ can also consider factors such as daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; and treatment, other than medication, received for relief of pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *7.

Statements about the intensity, persistence, and limiting effects of symptoms will be evaluated in relation to the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8. The ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements and the rest of the evidence. *Id*. But the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *5). Rather, the symptoms will be determined to diminish a claimant's capacity for basic work activities to the extent that the alleged functional limitations and restrictions due to the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8.

Here, the ALJ began the RFC analysis by summarizing Plaintiff's self-reported symptoms and hearing testimony about allegedly debilitating effects of Plaintiff's narcolepsy, such as excessive sleepiness and fatigue. (R. 23). Plaintiff also testified about the limited benefits of her medications and how these symptoms negatively affected her life and employment prospects. (*Id*.) The ALJ then evaluated the medical records. (*Id*.) Following the two-step process, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id*.) But the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id*.) The ALJ noted that Plaintiff's "care has been routine and conservative throughout the relevant period" and "even with said treatment, although not completely resolved, [her] treatment regimen has shown some improvement in symptomatology." (*Id*.) The ALJ further pointed out that evidence concerning Plaintiff's activities of daily living, such as attending college (R. 404) and working during the relevant period (*see, e.g.*, R. 353–54, 404) "are consistent with the ability to perform some work activity on a regular basis." (R. 23–24).

Contrary to Plaintiff's argument, the ALJ did not disregard Plaintiff's statements about her symptoms based solely the failure of objective medical evidence to substantiate her statements. *Arakas*, 983 F.3d at 95. In analyzing the extent of the alleged symptoms, the ALJ relied on both objective medical evidence and other evidence in the record, such as observations by medical professionals and treatment history. The ALJ also considered factors such as daily activities,

medication and treatment. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *7. Moreover, the ALJ is allowed to consider the "type, dosage, effectiveness, and side effects of any medication" Plaintiff took as well as other treatment she received. 20 C.F.R. § 404.1529(c). "Indeed, it is the ALJ's duty to analyze and synthesize the medical record as a whole." *Nuton v. Astrue*, SKG-08-1292, 2010 WL 1375297, at *4 (D. Md. Mar. 30, 2010)

As discussed above, Plaintiff was consistently prescribed the same medications with the same instructions on dosage since 2015. Ms. Jamieson suggested that she contact the Johns Hopkins University sleep clinic for clinical trials or consultations. (R. 349). Other providers recommended that Plaintiff see a psychiatrist to address the negative impact of psychological factors such as stress and depression on her narcolepsy, and they also contemplated an updated MSLT. (R. 425). It does not appear that any of these options were pursued. As such, the ALJ's characterization of Plaintiff's medication and other treatment is not unreasonable and is consistent with the record. Because the ALJ's findings are supported by substantial evidence, Plaintiff's argument is unavailing.

In sum, substantial evidence supports the ALJ's RFC assessment, as it is based on the evidence in the record, including the treatment notes, medical opinions, and Plaintiff's subjective statements. Therefore, remand is not warranted.

## V.    Conclusion

Because there is substantial evidence to support the ALJ's findings and the findings were reached through application of the correct legal standards, Plaintiff's Motion for Summary Judgment (ECF 12) will be DENIED, and Defendant's Motion for Summary Judgment (ECF 13) will be GRANTED. The SSA's decision will be AFFIRMED pursuant to sentence four of 42 U.S.C. § 405(g). A separate Order will follow.

Sincerely,

/S/

Matthew J. Maddox
United States Magistrate Judge